**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN THIEDE,

      Plaintiff,

v.                                            Case No. 16-13650

LEROY BURCROFF, et al.,

      Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

      Plaintiff is a firefighter for the City of Romulus. He brings this suit alleging that he was unlawfully retaliated against for exercising his First Amendment rights. He claims that Defendant LeRoy Burcroff (the Mayor of Romulus), Defendant Julie Wojtylko (the Mayor's Chief of Staff), and Defendant Jadie Settles (the Director of Public Safety and Plaintiff's supervisor), improperly suspended him after text messages between Plaintiff and a former Romulus employee were disclosed to the City. Plaintiff also names the City of Romulus as a Defendant.

      Presently before the court are three motions for summary judgment: Defendants Burcroff, Wojtylko, and City of Romulus move for summary judgment as to all of Plaintiff's claims (Dkt. #33); Defendant Settles similarly moves for summary judgment as to all of Plaintiff's claims against him (Dkt. #36); and Plaintiff moves for partial summary judgment as to Count III of his Complaint, which seeks declaratory judgment that the City of Romulus's "Policy #34" is a facially unconstitutional prior restraint of free speech (Dkt. #37). The motions are fully briefed and the court held a hearing on November 29,

2017. Following the hearing, the court ordered supplemental briefing from both parties, asking them to address whether Plaintiff has standing to challenge the constitutionality of Policy #34. (Dkt. #47.) For the following reasons, Defendants' motions are granted and Plaintiff's motion is denied.

## I. BACKGROUND

Plaintiff's suit finds its origin in a case formerly before this court: *Guzall v. City of Romulus*, No. 13-11327 (E.D. Mich.) (Parker, J.). The plaintiff there—Marianne Guzall— alleged that she was unlawfully terminated by the City of Romulus and some of its employees because she exercised her First Amendment right to speak out about alleged corruption in Romulus. (*See* Guzall Compl. Dkt. #41-2.) At some point during that litigation, Guzall was ordered to disclose over 1200 text messages exchanged between her and Plaintiff. (Dkt. #41 Pg. ID 1057.) According to Plaintiff, these text messages "discussed government corruption, misuse of public funds, suspected illegal activity, and Plaintiff[']s assistance/participation in the *Guzall* litigation." (Dkt. #41 Pg. ID 1057.) The court in *Guzall* granted summary judgment to the defendants, and judgment was entered in their favor. *Guzall v. City of Romulus*, No. 13-11327, 2017 WL 3394751, at *16 (E.D. Mich. Aug. 8, 2017) (Parker, J.).

Though none of the individual Defendants in this case were named in *Guzall*, they nonetheless learned of the text messages. Sometime in July 2016, the Romulus City Attorney provided Defendants Burcroff and Wojtylko copies of the texts, and they read some—though not all—of them. (Dkt. #41-5 Pg. ID 1316, 1323–24; Burcroff Dep. Dkt. #41-6 Pg. ID 1358; Wojtylko Dep. Dkt. #41-7 Pg. ID 1381.) Defendant Wojtylko was "saddened" and "disappoint[ed]" by the messages. (Wojtylko Dep. Dkt. #41-7 Pg. ID

1381.) Defendant Burcroff cast them as "middle school gossip stuff." (Burcroff Dep. Dkt. #41-6 Pg. ID 1358.)

Sometime before August 2016, Defendant Settles learned about the text messages "in passing." (Settles Dep. Dkt. #41-11 Pg. ID 1431.) According to Defendant Settles, Defendants Burcroff and Wojtylko may have mentioned the texts in his presence, but he never discussed the texts with them. (*Id.*)[1] There is no dispute that Defendant Settles did not read the texts. (Dkt. #36 Pg. ID 738; Dkt. #42 Pg. ID 1661.)

What happened after the disclosure of the texts in *Guzall* (and why) is a matter of debate between the parties. The parties agree that the pertinent events happened on August 2, 2016—a primary election day in Michigan.

That morning, Defendant Burcroff received a phone call from Douglas Geiss, a former state representative. (Burcroff Dep. Dkt. #41-6 Pg. ID 1374.) Mr. Geiss informed Defendant Burcroff that there may be some election signs too close to polling places, a violation of rules requiring a buffer zone around polling places on election day. (*Id.*) The phone call was received just before Defendant Burcroff's weekly executive team meeting, which generally commences at 8:30am. (*Id.*) Defendants Wojtylko and Settles usually attend the weekly executive team meetings (*id.* at Pg. ID 1355), though the

---

[1] Plaintiff claims that Defendant Settles's deposition testimony, in which he testified the Defendants Burcroff and Wojtylko may have discussed the texts in his presence, contradicts Defendant Settles's signed discovery responses, in which he stated that he had not spoken to anyone about the texts. (Dkt. #42 Pg. ID 1661.) The court sees no discrepancy. Plaintiff never testified that he may have "discussed" the text messages with Defendants Burcroff and Wojtylko. (*Id.*) Rather, Defendant Settles testified that these Defendants may have *mentioned* the texts to him. (*See, e.g.*, Settles Dep. Dkt. #41-11 Pg. ID 1431) ("Q. What about Mayor Burcroff, did he ever mention the text messages? A. He may have. Like I said, there was never any direct conversation . . . .").)

parties have cited nothing in the record to indicate whether they were in attendance on August 2. The court has gleaned, of its own accord, that at least Defendant Settles was in attendance on August 2. (Settles Dep. Dkt. #41-11 Pg. ID 1442.) According to Defendant Settles, there was no discussion of the election at the meeting. (*Id.*)

That same day, Plaintiff—on his day off—was at the Romulus Athletic Center ("RAC") polling location supporting a candidate in the primary election. (Thiede Dep. Dkt. #41-4 Pg. ID 1280.) He posted his location on Facebook. (*Id.* at Pg. ID 1302.) He was wearing a t-shirt with an International Association of Firefighters emblem on it. (*Id.* at Pg. ID 1281.)

Around noon, two City of Romulus ordinance officers, at the direction of Defendant Burcroff, arrived at the RAC. They were purportedly there to check whether election activity was happening within the 100-foot buffer zone around the polling location. (*Id.* at Pg. ID 1300–03.) Plaintiff was acquainted with one of the ordinance officers. (Thiede Dep. Dkt. #41-4 Pg. ID 1299–30.)

The ordinance officers informed Plaintiff that the sign indicating the edge of the 100-foot buffer would need to be moved, and they moved it. (Thiede Dep. Dkt. #41-4 Pg. ID 1300, 1302.) Plaintiff believes that the ordinance officers were accusing him specifically of moving the 100-foot sign from where the City would have placed it. But he also admits that his name was never mentioned during his encounter with the ordinance officers. (*Id.* at Pg. ID 1302.) The City Clerk arrived during the interaction as part of her rounds checking the precinct. (*Id.*; Craig-Bragg Dep. Dkt. #41-10 Pg. ID 1408.) She was not at the location because of Plaintiff, but she apologized to Plaintiff for the inconvenience caused by moving the buffer sign. (Craig-Bragg Dep. Dkt. #41-10 Pg. ID

1407–08.) Plaintiff apparently told the City Clerk that "[t]his is a bad polling precinct if you can't give the hundred feet." (Thiede Dep. Dkt. #41-4 Pg. ID 1281.)

At some point, Defendant Settles was informed by the City Ordinance Director that there was a problem at the RAC involving someone wearing a "T-shirt that said fireman." (Settles Dep. Dkt. #41-11 Pg. ID 1419.) Defendant Settles went to the RAC with his secretary, and he got there about fifteen to thirty minutes after the ordinance officers left. (*Id.* at Pg. ID 1419–20; Thiede Dep. Dkt. #41-4 Pg. ID 1303.)

According to Plaintiff, Defendant Settles immediately came up to him and said "I heard you had a run-in with my ordinance." (Thiede Dep. Dkt. #41-4 Pg. ID 1303.) Plaintiff tried to explain what happened with the ordinance officers. He also told Defendant Settles "I don't work for you today" and "[y]ou're not my boss today." (*Id.* at Pg. ID 1303–04.) Another person volunteering at the RAC with Plaintiff similarly tried to explain what had happened with the ordinance officers. (Warren Decl. Dkt. #41-9 Pg. ID 1402.)

Defendant Settles suspended Plaintiff until further notice and then left. (Thiede Dep. Dkt. #41-4 Pg. ID 1304.) Plaintiff maintains that while he was "flabbergasted," he never yelled, never threatened Defendant Settles, and never used profanity. (*Id.* at Pg. ID 1303.)

Defendant Settles, however, describes Plaintiff's conduct and words as disrespectful and threatening. According to Defendant Settles, Plaintiff raised his voice, pointed his finger, and told Defendant Settles he wanted to "file a fucking complaint." (Settles Dep. Dkt. #41-11 Pg. ID 1424.) Plaintiff told Defendant Settles that he was not required to talk to him because it was his day off, and he continued to make threats,

including that he was going to call his attorney. (*Id.*) Defendant Settles maintains that he suspended Plaintiff because of Plaintiff's behavior and disrespect. (*Id.* at Pg. ID 1442.)[2]

Plaintiff was suspended (*with* pay) for one work day. (Thiede Dep. Dkt. #41-4 Pg. ID 1284, 1313.)[3] He has not been subjected to any discipline since then. (*Id.* at Pg. ID 1284.)

Sometime after Plaintiff's suspension, Robert McLachlan—a person identified only as a "City resident known to all parties in this matter" (Dkt. #33 Pg. ID 346)—visited the Mayor's Office. (McLachlan Dep. Dkt. #41-12 Pg. ID 1461; McLachlan Aff. Dkt. #41-8 Pg. ID 1399.) Defendant Wojtylko allegedly told McLachlan, "I'm aware you and [Plaintiff] are friends and are comparing notes. Be careful. There's more than what is on the surface. He said some hurtful, personal things about me in texts to [Guzall], for which I will never forgive him for. He's nobody's friend." (McLachlan Aff. Dkt. #41-8 Pg.

---

[2] Defendants repeatedly claim that Plaintiff admitted that he was suspended for his behavior towards Defendant Settles. (*See, e.g.*, Dkt. #33 Pg. ID 345; Dkt. #36 Pg. ID 746.) The court finds Plaintiff's testimony on this point ambiguous at best. Plaintiff's deposition testimony reads as follows:

Q.    Mr. Thiede, you would agree with me you weren't suspended for working the polls, you were suspended because of your behavior and demeanor toward the director when he was asking you questions about whether you had been involved in an incident with the ordinance officers, correct?
MR. SKLAR: I'll object to form and foundation. You can answer if you know.
A.    I understand, and my witness will attest –
MR. SKLAR: Stop it. The question is –
A.    (Continuing) No
Q.    (By Ms. Forbush) So, your answer is yes?
A.    Yes.

(Thiede Dep. Dkt. #41-4 Pg. ID 1289.) Taking this testimony in the light most favorable to Plaintiff, the court finds that Plaintiff did not admit that the reason for his suspension was his alleged insubordination.

[3] Though it is an immaterial point, the court noted at oral argument the seeming oddity of a sanction that equates to awarding one additional day of paid vacation.

ID 1399.) Defendant Wojtylko continued: "[Plaintiff] knows that we're coming after him for those texts made while on duty, and he took the opportunity to react the way he did at the RAC to deflect the attention to cover his ass." (*Id.*)

Defendant Burcroff also advised McLachlan "as a friend" to distance himself from Plaintiff because Plaintiff was toxic. (*Id.*) Defendant Burcroff allegedly told McLachlan that the "RAC 'incident' was the least of 'his problems.'" (*Id.*) Somewhat contradictorily, he also apparently told McLachlan that he had spoken with Defendant Settles and that the interaction at the RAC should have resulted in "no more than a verbal reprimand because . . . it clearly never should have happened." (*Id.*)

In September 2016, the City of Romulus adopted "Policy #34." (Dkt. #37 Pg. ID 773.) Policy #34 provides:

> From time to time, the City of Romulus may be sued in a Court of law. All verbal or written communications, information or documents in the possession of the city related to City business requested by a party to the litigation, or by a third party on behalf of the party to the litigation, must be coordinated through the City Attorney or the attorney representing the City.
>
> Therefore, all employees of the City shall not provide any information or documents related to the City to a litigant or a third party representing a litigant, unless otherwise designated by the Mayor.
>
> Further, all information or documents related to the City must be provided to the City Attorney, or other attorney representing the City in the litigation, for distribution to the parties in the litigation or their representatives.

(*Id.*) There is no dispute that Plaintiff has never been found in violation of Policy #34.

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must

view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). It is the parties' responsibility to support their factual assertions by citation to the record; the court is under no obligation to search for materials in the record uncited by the parties. Fed. R. Civ. P. 56(c).

### III. DISCUSSION

Plaintiff brings two claims arising from his suspension: First Amendment retaliation and violation of the Michigan Whistleblower's Protection Act ("WPA"). He also seeks declaratory judgment that Policy #34 is an unconstitutional prior restraint on First Amendment free speech. Each count will be addressed in turn.

### A. First Amendment Retaliation

Plaintiff claims that the texts messages he exchanged with Guzall are constitutionally-protected speech for which he was unlawfully disciplined.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). A claim for First Amendment retaliation requires proof of three elements: "1) the plaintiff engaged in constitutionally protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the

protected speech was a 'substantial' or a 'motivating factor' in the adverse action."

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001); *see also*

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008). Defendants

argue that Plaintiff's texts are not protected First Amendment speech[4] and that, even if

Plaintiff's texts are protected, he has not established the required causal connection—a

"substantial" or "motivating" factor—between his speech and his suspension. The court

agrees with Defendants on both points.

The individual Defendants also argue that they are entitled to qualified immunity

on this claim (*see* Dkt. #33 Pg. ID 355–57; Dkt. #36 Pg. ID 753–57) and Defendant

Settles argues that Plaintiff's claim against him in his official capacity should be

dismissed as duplicative of Plaintiff's claim against Defendant City of Romulus (Dkt. #36

Pg. ID 753–57). The court does not address these latter arguments because

Defendants are entitled to summary judgment on other grounds.

### 1. Protected Speech

The court determines as a matter of law whether a public employee engaged in

constitutionally-protected speech. *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004).

Where the plaintiff is a public employee, the plaintiff must meet three requirements to

establish that his speech is protected: (1) the employee's speech must relate to a matter

---

[4] Defendant Settles did not address the issue of protected speech in his motion, and Plaintiff therefore argues that Defendant Settles "concedes that Plaintiff engaged in conduct protected under the [First Amendment]." (Dkt. #42 Pg. ID 1678.) Defendant Settles, however, filed a joinder and concurrence in the motion for summary judgment by the other Defendants; that motion argued that Plaintiff's speech is not entitled to protection. (Dkt. #38 Pg. ID 1007.) Because the court decides whether Plaintiff's speech was protected as a matter of law, *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004), the court finds that Defendant Settles adequately challenged the status of Plaintiff's speech.

of public concern, *see Connick v. Myers*, 461 U.S. 138, 143 (6th Cir. 2010); (2) if the employee's speech relates to a matter of public concern, the employee's interest "in commenting on matters of public concern . . . [must] outweigh[] the employer's interest in promoting the efficiency of the public services it performs through its employees," *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); and (3) the employee's speech must not be made "pursuant to . . . official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). These three requirements—the "public concern," "balancing," and "pursuant to" requirements—must all be satisfied for a public employee's speech to be protected. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 338 (6th Cir. 2010). Defendants challenge the first requirement: they argue that Plaintiff has not demonstrated that his speech relates to a matter of public concern.

Speech addresses a matter of public concern when it "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg*, 253 F.3d at 898 (internal quotation and citation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Accordingly, the Sixth Circuit employs the "focus" test in determining whether speech touches on a matter of public concern. *Farhat v. Jopke*, 370 F.3d 580, 592 (6th Cir. 2004). The court looks to the point or focus of the speech in question and what the speaker intended to communicate. *Id.* It does not matter whether the speech was communicated to the public at large; private conversations are also

entitled to protected status where the focus is a matter of public concern. *Handy-Clay*, 695 F.3d at 544.

The court examines the speech's content, not the speaker's motivation, when determining its focus. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543–44 (6th Cir. 2012). Cursory references to private matters do not deprive otherwise protected speech of its protected status. *Farhat*, 370 F.3d at 589 ("[T]he entire speech does not have to address matters of public concern, as long as some portion of the speech does so.").

But the reverse is also true, as minor or offhand comments will not blanket all of a plaintiff's speech with First Amendment protection. *Id.* "[T]he proper inquiry is *not* what might be 'incidentally conveyed' by the speech, and . . . 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern'" where private interests are the primary focus. *Id.* at 592–93.

Of particular difficulty are cases involving "mixed speech": cases in which the employee's speech arises out of an "employment grievance or other personnel dispute" and the employee claims some part of the speech touches on matters of public concern. *Farhat*, 370 F.3d at 590; *see also Connick v. Myers*, 461 U.S. 138, 149 (1983) (holding that one question in a survey containing fifteen touched on a matter of public concern and proceeding to do a *Pickering* analysis). Where the "focus" of an employee's speech is an expression of personal grievances, the speech is not entitled to protection. *Farhat*, 370 F.3d at 593. This includes complaints "of a personal nature that come from working with [a public official] on a daily basis rather than those that touch on political, policy, or social matters affecting the public." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 296 (6th Cir. 2012).

Concomitant with the right to speak is the right to listen. *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972). The freedom of speech "necessarily protects the right to receive." *Id.* (alterations omitted) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). What an employee hears is also entitled to constitutional protection, therefore, where it touches on a matter of public concern.

Plaintiff argues that the text messages here "discuss matters at the height of public concern." (Dkt. #41 Pg. ID 1075.) Plaintiff avers that:

> The text[s] discuss government corruption (TM 143),[5] use of public funds to settle a prior whistleblower lawsuit (TM 20, 1086), "shady" campaign contributions (TM 30–31), falsification of public records and possible insurance fraud by City officials (TM 48), misuse and waste of public funds (TM 51, 239), destruction of evidence (TM 65), inefficient operation of government (TM 95), excessive salaries for political appointees (TM 108, 142, 156, 403, 583, 1216), breach of public duty (TM 182), and intimidation of a witness (TM 1189–1186 [sic]).

(Dkt. #41 Pg. ID 1074.) In all, Plaintiff cites about twenty out of over 1200 text messages (depending on how one counts the apparent error in citation for the last set of texts). The court has examined all of the cited texts Plaintiff cites. Six were sent by Plaintiff, the rest were sent to Plaintiff by Guzall.

---

[5] "TM," as used by Plaintiff, means "text message." Plaintiff cites the sequentially-numbered text messages, attached as an exhibit to his response (Dkt. #41-3), throughout his briefing. The court notes that Plaintiff seems to have made a typographical error in his citation method—though the numbers in this exhibit refer to the text appearing *below* the number, Plaintiff uses the numbers to refer to the text message appearing above. (*See, e.g.*, Dkt. #41-3 Pg. ID 1163. Plaintiff cites "TM 143" as referring to "government corruption." According to the exhibit, TM 143 reads: "Have you heard anything about who will run against Burcroff next election?" TM 142, on the other hand, reads: "All of council must be in Burcroff's pocket.") For the sake of clarity, the court will use Plaintiff's citation method and refer to the text appearing above the identifying number.

The first cited text sent by Plaintiff is one he identifies as referring to "use of public funds to settle a prior whistleblower lawsuit." It reads: "Like to kno [sic] how dickerson steps down stating lambert had no integrity and cant [sic] work fir [sic] him yet the city paid a settlement because he told a cop to destroy a tape." ("TM 20" Dkt. #41-3 Pg. ID 1151.) Another text apparently covers the same topic: "Funny that the city settled on the whistleblower case from the cop against dickerson and paid him off." ("TM 1086" Dkt. #41-3 Pg. ID 1253.) A third text refers to employee salaries: "U saw the salearies [sic]. Monte and shelby over 200000." ("TM 583" Dkt. #41-3 Pg. ID 1205.) Another two texts[6] read: "Yep" and "Fyi kevin ladach got demoted to patrolman." ("TM 1187–88" Dkt. #41-3 Pg. ID 1263.) Finally, Plaintiff cites what appears to be a photo message. ("TM 1216" Dkt. #41-3 Pg. ID 1267.) Next to the photo is some handwriting, the source or veracity of which the court cannot identify, that reads: "The salaries thing I got from my mother It [sic] was on her mailbox." The court cannot decipher what is depicted in the photo.

Guzall's messages cover further complaints about the City and its employees. Texts about "shady" campaign contributions include one that reads:

> I am going to make sure that voters have a bullet point flyer of anything that I am allowed to make public[.] it's the right of the voters to be informed[.] I am also going to get a copy of his campaign finance report and highlight all of the donors that contributed to Lambert's administration.

("TM 30" Dkt. #41-3 Pg. ID 1152.) One about "misuse of public funds" includes:

> Do you happen to know if Julie is allowed to be covered by the city's medical again? Was this just a creative way if [sic] giving her a bonus? Did you know that lambert [sic] is telling people that he is running again? Have

---

[6] In the range of TM 1186–1189, which the court assumes is what Plaintiff meant to refer to in briefing.

you heard anything like that? Funny since his attorney told the judge that
he was to be arraigned any day[.] these people are unbelievable!

("TM 51" Dkt. #41-3 Pg. ID 1154.) Another on misuse of public funds: "Who is paid to

maintain the city's FB page? I find it hysterical when there are misspelled words!!! Dear

god I hope that's not what 90k buys you!!!" ("TM 239" Dkt. #41-3 Pg. ID 1173.) Texts on

"excessive salaries" include: "The residents need to start asking questions[.] they

deserve much better than this[.] fat cats making equally fat salaries without a thought

about the residents[.]" ("TM 403" Dkt. #41-3 Pg. ID 1188.)

Plaintiff has not established that his speech was protected. The court agrees with

Defendants that the text messages here are most appropriately categorized as personal

workplace grievances and complaints "of a personal nature that come from working with

[a public official] on a daily basis." A cursory examination of the few text messages

appearing before and after each of Plaintiffs' cited texts reveals that those cited by

Plaintiff are "fleeting" or "passing references" to matters of arguably public concern. The

focus of Plaintiffs' conversations was Guzall's complaints about her former coworkers

and the progress of her lawsuit.

TM 19, for example, reads: "Ironic, isn't it? That he would request I be terminated

but hire Tim and Dickerson back after they 'resigned' because they couldn't work for

Lambert lol." ("TM 19" Dkt. #41-3 Pg. ID 1151.) TM 21 covers the lawsuit: "I guess Leroy

doesn't care that they look like liars avoiding depositions . . . ." ("TM 21" Dkt. #41-3 Pg.

ID 1151.) So does TM 73: "I can't wait to sit across from that big holier than thou Julie

and see her flat out lie[.] she's such a woman of god[.]" ("TM 73" Dkt. #41-3 Pg. ID

1156.) This pattern continues on each cited page.

Though Plaintiff styles the texts he does cite as "just a sample," (Dkt. #41 Pg. ID 1075), it is Plaintiff's burden—not the court's—to examine the record and support his factual assertions with citations. *See* Fed. R. Civ. P. 56(c). Plaintiff has cited a small fraction of the text messages produced in the *Guzall* litigation, and even those are surrounded by text messages unrelated to matters of public concern. On this record as cited, the court cannot find as a matter of law that the "focus" of Plaintiff's conversations was "information . . . needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg*, 253 F.3d at 898 (internal quotation and citation omitted). Plaintiff's speech was not protected.

### 2. Causation

Even if Plaintiff had demonstrated that his speech was protected, however, he cannot establish the third required element of a retaliation claim: that his suspension was motivated by his speech.

To meet the causation element of First Amendment retaliation, a public employee must demonstrate (1) that an individual defendant proximately caused the adverse employment action and (2) that the individual defendant was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). The causal element requires the employee to "point to specific, nonconclusory allegations reasonably linking [his] speech to employer discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotations and citations omitted).

Because this element can "rarely" be met by production of direct evidence, circumstantial evidence is most often required. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580

(6th Cir. 2005). A plaintiff may therefore point to the "temporal proximity" between the protected speech and the adverse action, and the temporal proximity may be so strong as to "creat[e] an inference of retaliatory motive." *King*, 680 F.3d at 695. The Sixth Circuit, however, has been "reluctant" to find that temporal proximity is sufficient where the plaintiff cannot point to other evidence of retaliatory motive. *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012).

Comments made by individuals who were uninvolved in the adverse employment decision—even where those comments seem to be retaliatory—are insufficient to establish causation. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001).

Plaintiff has not pointed to nonconclusory evidence in the record that would allow a reasonable jury to find, by a preponderance of the evidence, that he was suspended for his speech. Plaintiff's factually-supported evidence amounts to the following: a temporal link between his suspension and the speech at issue (around a month from disclosure of the texts to suspension); testimony that Defendants Burcroff and Wojtylko harbored some animus as a result of the text messages; Defendant Wojtylko's statement that "[Plaintiff] knows that we're coming after him for those texts made while on duty"; Defendant Burcroff's "admission" of the "pretextual nature" of Plaintiff's suspension; and testimony that Defendant Settles's decision to suspend Plaintiff was unwarranted based on Plaintiff's August 2 conduct. But in the context of the whole record, this evidence is insufficient to withstand summary judgment.

Plaintiff alleges that Defendants Burcroff, Wojtylko, and City of Romulus are responsible for his suspension after his encounter with Defendant Settles. Even assuming, as the court must, that Defendants Burcroff and Wojtylko were upset over

learning about and reading some of Plaintiff's text messages, Plaintiff has not demonstrated that they were somehow involved in the August 2 interaction he had with Defendant Settles. *See Smith*, 250 F.3d at 1038. Defendant Settles was the one who decided to suspend Plaintiff, and there is nothing in the record to suggest that Defendants Burcroff and Wojtylko were at all involved in that decision.

Plaintiff attempts to bridge this gap by claiming, without citation, that Defendant Burcroff received "automatic notice" of Plaintiff's location on August 2 because Plaintiff and Defendant Burcroff were Facebook "friends" and Plaintiff posted his location on Facebook. But this proposition is nowhere supported in the record. Tellingly, though Plaintiff testified that he was Facebook friends with Defendant Burcroff (Thiede Dep. Dkt. #41-4 Pg. ID 1302), Plaintiff has cited nothing indicating that he ever asked Defendant Burcroff—at deposition or any other time—whether Defendant Burcroff received or saw Plaintiff's Facebook post. Plaintiff also says in briefing that he was Facebook friends with Defendant Wojtylko (Dkt. #41 Pg. ID 1058), but he has cited nothing in the record to support this assertion, either.

Plaintiff presents the court with a trail of inferences too long and tenuous to survive summary judgment. Plaintiff asks a future jury to assume that Defendant Burcroff saw Plaintiff's Facebook post; that Defendant Burcroff realized—based on his phone call about ordinance signs earlier in the day—that Plaintiff was in a position to be blamed for violating the ordinance; that Defendant Burcroff communicated Plaintiff's location to Defendants Wojtylko and Settles or otherwise discussed Plaintiff at their scheduled morning meeting (though the record does not reflect whether Plaintiff's Facebook post was made before or after that meeting); that one of the Defendants sent

ordinance officers to the RAC to stage a run-in with Plaintiff; that Defendant Settles waited until he was contacted by the City Ordinance Director before making his way to Plaintiff's location; that Defendant Settles then falsely accused Plaintiff of having a run-in with the ordinance officers; and that all this happened despite the undisputed fact that Defendant Settles never read the text messages at issue in this case.

To be sure, all of these events *may* have happened. But Plaintiff is not entitled to raise the specter of possibilities without supporting evidence. The evidence Plaintiff does point to—the temporal connection and the animus Defendants Burcroff and Wojtylko may have had toward him and these text messages—cannot support the weight of the otherwise unsupported inferences a jury would be required to find to sustain liability. *See Rodgers*, 344 F.3d at 602.

Plaintiff's case, in other words, is not one in which a temporal connection alone can create an inference of retaliatory motive because Plaintiff has presented no other evidence sufficient to demonstrate retaliation. While Plaintiff points to the statements allegedly made by Defendants Burcroff and Wojtylko as evidence of retaliatory motive, these statements cannot support that claim without some evidence that Burcroff and Wojtylko were involved Plaintiff's suspension. *See Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001). The fact that Defendant Burcroff's and Defendant Wojtylko's views of Plaintiff changed after reading these text messages is neither surprising nor sufficient to withstand summary judgment where there is no evidence they were involved in his interaction with Defendant Settles on August 2.

The court also fails to see, as Plaintiff would have it, how Defendant Burcroff's statement that the suspension "clearly never should have happened" amounts to a

naked admission of pretext. It seems to the court that this statement could just as easily be some acknowledgment that a suspension for alleged insubordination was unwarranted. The court does not engage in credibility determinations on a motion for summary judgment, but this statement—even if made—would not provide a jury with enough evidence to find by a preponderance that Plaintiff was terminated as a result of his speech.

Plaintiff has, in short, failed to demonstrate a causal chain that should be sent to a jury. *See Rodriguez v. Stryker Corp.*, 680 F.3d 568, 573 (6th Cir. 2012) ("Trial and appellate courts must decide whether the inferences a party asks the jury to draw are too speculative to be reasonable."); *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072 (6th Cir. 1999) (summary judgment appropriate where "the evidence presented leaves a 'gap' that is simply too wide to allow a jury to speculate on the ultimate issue of causation"); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986) ("Evidence suggesting a mere possibility is not enough to get past the summary judgment stage.") Plaintiff virtually acknowledges the speculative nature of his assertions by making statements like "Burcroff and Wojtylko *most likely* shared their animus toward Plaintiff with Settles, who they saw and spoke to almost every day," (Dkt. #41 Pg. ID 1077 (emphasis added)), and "Plaintiff volunteered for Ms. Geiss and Burcroff *may* also have learned of Plaintiff's planned attendance at the RAC at that time," (Dkt. #41 Pg. ID 1079 (emphasis added)). Without support in the record, they remain mere hopeful speculations, and are insufficient to survive summary judgment.

The court also notes that—to supplement the dearth of record evidence establishing causation—Plaintiff seems to rely on allegations that some witnesses are

not telling the truth. Plaintiff, for example, "disputes the truthfulness" of Defendant Settles's testimony that he was informed about the trouble at the RAC by the Ordinance Director—not Defendant Burcroff or anyone else with knowledge that Plaintiff was there. (Dkt. #42 Pg. ID 1668.) This, too, is insufficient to survive summary judgment. A party may not rely on statements that his opponent is lying or misstating the truth—he must come forward with *evidence* that creates a genuine issue of material fact. Plaintiff has not done so, and Defendants are entitled to summary judgment.

## B. Violation of the Michigan Whistleblower's Act

The Michigan Whistleblower Protection Act ("WPA"), Mich. Comp. Laws § 15.362, "protects an employee against an employer's retaliatory employment actions, including discharge, when the employee is engaged in protected activity." *Whitman v. City of Burton*, 831 N.W.2d 223, 225 (Mich. 2013). Much like a claim for First Amendment retaliation, a WPA claim requires the plaintiff to prove "(1) he or she was engaged in protected activity as defined by the act, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action." *Id.* at 229.

Plaintiff claims that Defendants' actions violated the WPA for the same reasons that they amount to First Amendment retaliation. He also argues that Defendant Wojtylko's "statement" that "we're coming after him for those texts" is itself a violation of the WPA because it is a threat made as a result of Plaintiff's protected activity. (Dkt. #41 Pg. ID 1086 (citing *Randazzo v. City of Inkster*, No. 324149, 324400, 2016 Mich. App. LEXIS 496, at *3 (Mar. 15, 2016)).).

Defendants contend that Plaintiff's WPA claim fails for two reasons: Plaintiff cannot establish causation as required by the Act, and Plaintiff did not engage in protected activity. For the reasons stated above, Plaintiff has not established that there is a genuine issue of material fact as to whether his speech was a motivating factor in his suspension. The court finds, therefore, that Defendants are entitled to summary judgment on Plaintiff's WPA claim arising out of his suspension.

Plaintiff's WPA claims for suspension and Wojtylko's comment also fail, however, because he did not engage in activity protected by the Act. The WPA protects three kinds of activity: "reporting a violation of law, regulation, or rule to a public body; being about to report such a violation to a public body; and being asked by a public body to participate in an investigation or court action." *Talhelm v. ABF Freight Sys., Inc.*, 364 F. App'x 176, 188 (6th Cir. 2010). The statute defines "public body" as:

> (i) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.

> (ii) An agency, board, commission, council, member, or employee of the legislative branch of state government.

> (iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.

> (iv) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.

> (v) A law enforcement agency or any member or employee of a law enforcement agency.

> (vi) The judiciary and any member or employee of the judiciary.

Mich. Comp. Laws § 15.361(d). There is no dispute that Guzall is not a "public body" for the purposes of the WPA. Indeed, Guzall was no longer employed with the City at the time she and Plaintiff exchanged their text messages. (Thiede Dep. Dkt. #41-4 Pg. ID 1285.) To qualify as protected activity, then, Plaintiff's speech must fall in the third category: being asked by a public body to participate in an investigation or court action.

An employee may "participate" in an investigation or court action without actually testifying or providing evidence—a request to participate is all that is required. *Shaw v. Ecorse*, 770 N.W.2d 31, 39 (Mich. App. 2009). The Act itself does not define what it means to "participate." The dictionary defines "participate" as "to take part"; "to have a part or share in something." *Participate*, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/participate.

Plaintiff argues that his "participation in the *Guzall* suit occurred as soon as Defendants obtained his texts by court order." (Dkt, #41 Pg. ID 1085.) Plaintiff does not dispute, however, that he was never subpoenaed or requested to provide information, evidence, or testimony as part of the *Guzall* case. He did not, therefore, participate in the litigation. He did not "take part" or "have a part" in the *Guzall* litigation. While his previously recorded *speech* may have played a role in that case, *he* did not.

But, Plaintiff argues, the WPA, "[b]y its express terms," (*id.* at Pg. ID 1084) provides protection even when "a person [is] acting on behalf of the employee," Mich. Comp. Laws § 15.362. Thus, according to Plaintiff, he was requested to participate in the *Guzall* litigation when Guzall handed over their text messages. Plaintiff fails, however, to explain how Guzall was acting on his behalf in providing these text messages. Guzall handed over the text messages because she was ordered to by the

court. Plaintiff has pointed to no evidence on the record demonstrating that Guzall's production of the texts pursuant to a court order was in any way done at his direction or for his benefit. Indeed, he admits that he was not involved in their production and does not even know when or how they were produced. (Thiede Dep. Dkt. #41-4 Pg. ID 1295, 1297.)

Plaintiff did not participate in the *Guzall* litigation. Plaintiff, therefore, is not entitled to WPA protection on the basis that he participated in an investigation or court action.

### C. Policy #34

Finally, Defendants Burcroff, Wojtylko, and the City of Romulus have moved for summary judgment on Plaintiff's claim that Policy #34 is an unconstitutional prior restraint on free speech. Plaintiff has cross moved, asking this court for declaratory judgment that Policy #34 is unconstitutional and to enjoin its enforcement.

As noted above, the "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The employee's right is limited, however, by the fact that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions" to promote the efficient and effective provision of public services. *Id.* at 418. Accordingly, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).

"A prior restraint is any law 'forbidding certain communications when issued in advance of the time that such communications are to occur.'" *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012). When analyzing a prior restraint on a public employee's speech, the court begins with the same two-part *Pickering* test it uses to evaluate whether an employee's speech is protected for a First Amendment retaliation claim. *See United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 465–68 (1995) ("*NTEU*"). The court determines whether the employee was speaking as a citizen upon matters of public concern and, if so, then asks whether the employee's interest in speaking is outweighed by "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 465–66 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). A prior restraint requires an additional inquiry, however, as the "Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *Id.* at 468 (internal quotation omitted).

### *1. Standing*

The court begins with an issue not initially addressed by the parties: whether Plaintiff, who was indisputably not punished under Policy #34, has standing to challenge its constitutionality. Concerned about Plaintiff's ability to establish standing, the court ordered the parties to submit additional briefing on the issue. (Dkt. #47.) The court, having reviewed the briefing, concludes that Plaintiff lacks standing to pursue his claim for declaratory judgment.

As noted in the court's order directing further briefing, federal courts lack jurisdiction where there is no "case" or "controversy" within the meaning of Article III of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* The party invoking federal court jurisdiction has the burden to demonstrate standing. *Id.* at 561. In response to a summary judgment motion, therefore, a plaintiff must come forward with concrete evidence—not "mere allegations"—that establish standing. *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016).

Standing requires proof of three elements: (1) *injury in fact*, a violation of a legally-protected interest that is both (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical"; (2) a *causal connection* between the injury and the complained-of conduct; and (3) *redressability*, that it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560 (internal quotations omitted).

Standing does not always require that a plaintiff challenging the constitutionality of a law have that law enforced against him. That is, a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). He must, however, allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, __ U.S. __, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Each of these allegations—intent to engage in conduct affected with a

constitutional interest, proscription by statute, and threat of prosecution—is analyzed separately. *See, e.g.*, *id.* at 2343–47; *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016); *Kiser v. Reitz*, 765 F.3d 601, 608–10 (6th Cir. 2014).

Plaintiff has failed to establish this last requirement: threat of prosecution.

Though allegations of overbreadth and vagueness are sometimes called "exceptions" to traditional standing rules, *see Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012), standing still requires a plaintiff to point to "some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact," *Morrison v. Bd. of Educ.*, 521 F.3d 602, 609 (6th Cir. 2008). Injury-in-fact therefore requires a plaintiff to show that enforcement occurred or is imminent—allegations of subjective chill are insufficient. "[A]bsent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists." *Id.* at 609.

Imminence may be found "where plaintiffs allege a subjective chill *and* point to some combination" of other facts demonstrating likely enforcement. *McKay*, 823 F.3d at 869 (emphasis original). A plaintiff may point to: "(1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely," like a provision permitting members of the public to initiate enforcement actions. *Id.* (internal citations omitted). The court may also take into account a defendant's refusal to "disavow enforcement" against the particular plaintiff. *Id.*

No such facts are alleged here. In response to the court's order for supplemental briefing, Plaintiff has—for the first time—put before the court his own affidavit, in which he describes the kind of conduct he is afraid to engage in because of Policy #34. Specifically, Plaintiff alleges that "I have limited my communications with Ms. Guzall because I am fearful that I will be disciplined and perhaps even discharged if I violate Policy #34 and communicate with Ms. Guzall as I did before Romulus implemented Policy #34." (Thiede Decl. Dkt. #48-1 Pg. ID 2275.) He similarly alleges that he is "fearful of speaking to other employees" about this case and "fearful of communicating with any person involved in litigation with Romulus" because of Policy #34. (*Id.*)

What Plaintiff does not allege is any fact that, under prevailing law, would demonstrate enforcement of Policy #34 is imminent. He does not allege that Policy #34 has been enforced against any City employee, including himself. (Indeed to date, the court has only the testimony of Defendants Burcroff and Wojtylko that Policy #34, to their knowledge, has not been enforced.) He does not allege he has received some warning letter under Policy #34 regarding his specific conduct. He does not allege that some member of the public may initiate enforcement of Policy #34. And he does not credibly allege that Defendants have refused to disavow enforcement of Policy #34. (Contrary to Plaintiff's assertion (Dkt. #48 Pg. ID 2270), *silence* as to enforcement of Policy #34 does not amount to a *refusal* to disavow enforcement.) Instead, his allegation that the threat of enforcement is sufficiently imminent rests on his belief that he was impermissibly suspended for the texts he sent—actions that occurred prior to the promulgation of Policy #34 and that, as noted above, lack sufficient factual underpinning. (*See* Dkt. #48 Pg. ID 2269.)

The court grants that there is some ambiguity in what conduct might be proscribed by Policy #34. Though Policy #34—when read as a whole—seems aimed at discovery requests that a public employee might respond to, Policy #34's middle directive amounts to a ban on all speech with a litigant, regardless of whether the speech is in response to a discovery request or not. The prohibition reads: "Therefore, all employees of the City shall not provide *any* information or documents related to the City to a litigant or a third party representing a litigant, unless otherwise designated by the Mayor" (emphasis added). This provision, as Plaintiff points out, makes no distinction between official and unofficial speech.

But Defendants Burcroff, Wojtylko, and City of Romulus continually repeat, in both briefing and at argument, that Policy #34 applies "only to requests for information by a party or their representative in such litigation." (*See, e.g.*, Dkt. #40 Pg. ID 1036.) They say that Policy #34 applies only to situations involving discovery requests in pending litigation. To the extent, then, that Plaintiff claims he is censoring himself by not speaking to Guzall or other City employees about the pending *Guzall* litigation or this case (*see* Thiede Decl. Dkt. #48-1 Pg. ID 2275), the court finds that his conduct amounts to a subjective chill. The court cannot find, based on Plaintiff's presented evidence, that enforcement of Policy #34 is imminent. Plaintiff has not established standing.

The court notes that rather than point to some fact demonstrating that enforcement of Policy #34 is imminent, Plaintiff seems to argue that no such fact is required. He quotes *Miller v. City of Wickliffe*, 852 F.3d 497, 506 (6th Cir. 2017): "A threat is credible, in this context, if a person must censor herself to avoid violating the

law in question." 852 F.3d at 506 (citing *Platt v. Bd. of Comm'rs*, 769 F.3d 447 (6th Cir. 2014); *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010)). But the keyword there is "must"—*Miller* (and the cases it cites as being "in this context") dealt with statutes amounting to an outright prohibition on certain types of speech in which a Plaintiff had demonstrated an intent to engage. They did not consider, as here, restrictions on speech resulting in a plaintiff's subjective chill.

In *Miller*, the plaintiffs made as-applied and facial challenges to a city ordinance requiring night clubs to apply for a permit. *Id.* at 502. The Sixth Circuit noted that to establish standing and ripeness in the First Amendment context, the plaintiffs would have to censor themselves to avoid violating the ordinance. *Id.* at 506. They would have, in other words, had to have planned to operate a night club without a permit, but self-censored to avoid violating the ordinance. The Sixth Circuit held that the plaintiff's claims were not ripe, however, because the plaintiffs had indisputably not applied for a permit. *Id.* The plaintiffs in *Miller*, notably, made no allegations of "subjective chill": they did not allege that they censored themselves out of fear of violating the ordinance or out of some anticipation that they might be prosecuted.

So, too, with *Platt* and *Carey.* Both *Platt* and *Carey* dealt with state campaign restrictions on candidates for judicial office. *See Platt*, 769 F.3d at 450; *Carey*, 614 F.3d at 193. In each of those cases, the plaintiffs established that they planned on engaging in conduct directly prohibited by the various statutes at issue. *Platt*, 769 F.3d at 452 (noting that the plaintiff "wishe[d] to publicly endorse candidates, personally and directly solicit campaign funds, and begin receiving campaign contributions earlier than 120–days before the primary," violations of the challenged law); *Carey*, 614 F.3d 196 (noting

that the plaintiff "want[ed] to let voters know his party affiliation[,] . . . to solicit campaign funds directly, . . . [and] to answer judicial questionnaires propounded by a local right-to-life organization," in contravention of the challenged law). Both *Platt* and *Carey* noted that while the challenged laws "at least chill[ed]" speech, some aspects of the plaintiffs' intended speech were also outright prohibited. *Platt*, 769 F.3d at 452; *Carey*, 614 F.3d 196. The *Platt* and *Carey* plaintiffs had not alleged that they were subjectively chilled by potential prosecution under the statutes. Rather, they alleged that they wanted, as judicial candidates, to engage in conduct directly proscribed by the statute. The Sixth Circuit determined that the outright prohibitions on their speech made enforcement sufficiently imminent to confer standing.

Plaintiff's allegations of subjective chill, without more, do not render enforcement of Policy #34 sufficiently imminent to confer standing. Plaintiff therefore lacks standing to pursue this claim, and Defendants are entitled to summary judgment.

## IV. CONCLUSION

Defendants have demonstrated that there is no genuine issue of material fact as to Plaintiff's claims for First Amendment retaliation or violation of the Michigan Whistleblower's Protection Act. Plaintiff, moreover, lacks standing to pursue his claim for declaratory judgment as to Policy #34. Accordingly,

IT IS ORDERED that Defendants Burcroff, Wojtylko, and City of Romulus' motion for summary judgment (Dkt. #33) is GRANTED.

IT IS FURTHER ORDERED that Defendant Settles's motion for summary judgment (Dkt. #36) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment (Dkt. #37) is DENIED.

A separate judgment will issue.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  January 18, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 18, 2018, by electronic and/or ordinary mail.

s/Lisa Wagner                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\KNP\Civil\16-13650.THIEDE.summary.judgment.KNP3.RHC.docx